May it please the court, my name is Suzanne Bradley and I represent Deputy Nunez and I'm the appellant. I ask the court to give me five minutes for rebuttal. I want to start today by talking about the background facts in this case because I think they are so important. This is a qualified immunity case and this event happened in December of 2019 and Mr. Benavides, the appellee, his daughter called her father and told him there was someone in the house and that she and her small children were upstairs barricaded in the bedroom. Mr. Benavides said call the police, I'm on the way. Now at the same time this young lady did call the police and two officers responded, Deputy Longshore and my client Deputy Nunez. Mr. Benavides beat the officers home. He parked his car in the yard, he went in, he searched, he didn't find an intruder. In the meantime, Deputy Nunez and Officer Longshore were outside. It was priority one home invasion call. They were on radio silence so as to not alert anyone in the house. Why were they doing that when they had already been told, hopefully by the dispatcher, that there was no one in the house? Because she had told the dispatcher, I'm not sure whether all of this is pertinent to the question before us about whether the gunshot, but since you started here, when Ms. Garibay called 911, she specifically informed the dispatcher that she thought someone had been previously in her home, but that they had left at least ten minutes before. So there was not a suspicion that there was someone in the house still. I don't know that that was communicated to the officers, Your Honor. The officers were told it was priority one and a home invasion, so that's how they reacted to that. So they were told the wrong thing by the dispatcher, there was a mixed mistake by the dispatcher from the get-go. I am not sure of that fact, Your Honor. That is not something that's sticking in my mind right now, perhaps opposing counsel can address it better, but it's my recollection that when those officers went out to the house that night, they did not know that the house, or that Ms. Garibay thought the house was empty. The house was empty, and then also she told the 911 dispatch driver there was a maroon Chevy pickup in the driveway, and that her father was on the way and would drive a white Chevy pickup. So with that information, that should have also been disclosed to the officers. Are you saying they didn't know that either? I don't think they did, Your Honor. Well, that's a problem from the dispatcher's point of view. Yes, it's a problem for the dispatcher, but it doesn't impact qualified immunity. You have to do it from the officer's perspective, Your Honor. If they didn't know that Ms. Garibay said there was no one in the house, they are approaching the house assuming that someone is there, and you have to do it from the officer's  Excuse me. Counsel, remind me of what discovery was done prior to this motion being filed. People deposed. I agree with you that it's from what the officer knew and acted upon at the time, and that he or she, in the general sense, can't be held responsible for factors that were not known to the officer. But it also seems clear that what the officers knew could be learned through deposing them or deposing the dispatcher to find out what information had been relayed. The dispatcher was not deposed. Mr. Benavidez was disposed. He's the gentleman who was shot in the leg, and my client was deposed. And let me start there with my client. My client has always testified and has always represented that it was an accidental shooting. And that is so key to this, because when the judge made his ruling, the very first sentence of Judge Hank's ruling is that there was fact issues regarding how to interpret the video. The problem is . . . Counsel, I hate to interrupt you because I think you're right in the wheelhouse of what the case is about. But the accidental shooting, I think in two contexts that it's going to be important to  One is whether it was an accident to shoot Mr. Benavidez as opposed to an intruder who the officer may have suspected. Turns out there wasn't, but he may have thought it was an intruder. So he shot purposefully, but accidentally shot the wrong person. The other inquiry, which I think the district court focused on, was whether or not it was an accidental discharge of the firearm that your client didn't intend to shoot at all, but that the firearm discharged and hit Mr. Benavidez. Your Honor, I think it's always been our position that it's been the second one. There's testimony from the officer that when he approached the house, and I want to go into this a little bit. I'll answer your question. But when he approached the house, he heard a dog whining in the garage. He saw garbage strewn in the yard. He found it suspicious that there was a car parked close to the house. There was a maroon pickup truck in the driveway. They walked around the perimeter of the house. They saw a screen off the window and they went to the other side of the house. The backyard was dark. When Officer Nunez approached the door, the window was on the left-hand side. He is right-hand dominant, and he put the gun in his left hand so he could reach for the doorknob and not be seen in the door. And at that moment, Mr. Benavidez opened the door, and in the transition back to his right hand, the officer testified that he accidentally discharged his weapon. Now, that's the deposition testimony. Can we stop you there for a second? There's no doubt that these officers walked into a difficult situation based upon the information they had and what they observed at the time, but what is it from that just a second or two- or three-second-long change from the left hand to the right hand? How can you establish from that, from viewing that, that it was an accident and not an intentional shot? This is how we establish. First of all, we asserted our qualified immunity. And it's the plaintiff or the appellee's burden to defeat qualified immunity. To defeat qualified immunity, and in the summary judgment context, you have to present evidence. They have only speculation that it was not an accident. I have an expert opinion. The case law says you can rely on that it was an accident. I also have the officer's consistent sworn testimony that it was an accident. But discuss the expert testimony and how they were able to establish or have an opinion that that was an accidental discharge and not an intentional firing? Your Honor, you spoke too quickly. I didn't hear your question. You mentioned an expert opinion that it was an accident. Would you please explain that? Well, Dr. Taylor, who has a law enforcement background, reviewed the evidence, reviewed the videotapes, and there were two body-worn cameras. There was my client's and Officer Longshore's. And when he looked at that and looked at the testimony, he gave the legal opinion that it was accidental. Based upon what? What did he say about it? I don't have it here in front of me, Your Honor. You have it in the record. Again, we're looking at an incident that just took place over two or three seconds. It was so quick, and the gun was moving from one hand to the other hand, and I'm just not understanding how you can say for a fact that that was an accident as opposed to an intentional. Let me answer it this way, Your Honor. There is no evidence that Nunez threatened to use force. There is no evidence that he took an armed firing stance in front of that door. There is no evidence that he intended to arrest the plaintiff. There was no seizure. And Nunez identified in that moment that he had to move his gun over here to defend himself. Now the undisputed evidence shows that Nunez is switching the gun between his hands. It's quick, but he is switching his guns. And he was disciplined for that, Your Honor. He was disciplined for not handling his gun appropriately out there on the scene, and I think that's important. He testified that it was an accident. And there's nothing in the video that contradicts his testimony. Now the court said the video was the classic summary judgment type thing, where it's an accident or it's not an accident. I would say that there's another umbrella over that that this court has to look at, and that's qualified immunity. The Supreme Court has said over and over again for decades that accidental shootings are not seizures. And in addition, a negligent shooting is not a constitutional violation. I know Your Honors know that case law. So it's their burden to disprove this. And in addition, they don't have proof of a clear consensus of cases. The appellee relies upon unpublished cases and cases that came out after these events in December of 2019. They are not dispositive for this court. And even taking a step back, I would argue strongly that it's never gone away that every seizure is a constitutional violation. And I cite the court to the Bower case. In the Bower case, the Supreme Court said accidental contact between an officer and a civilian is not a Fourth Amendment seizure, even if it injures the civilian. So the plaintiff in a 1983 accident must show force intentionally applied. And that's Bower 489 USC at 596 and 97. The plaintiff simply has no evidence other than his own speculation that this was an intentional shooting. And in truth- He has the video. He has the video. But- The video of the officer holding the gun in both hands and hitting it squarely at him and it going off. Your Honor, there's no dispute that Mr. Benavidez wasn't shot. And there's no dispute that my client shot him. The question is, was it an accidental discharge? I'm not disputing what the video shows. And the truth is, is that I believe that intent is not the ultimate driver here of qualified immunity. It's an objective analysis, not a subjective analysis. A reasonable jury could believe, based upon the video evidence, that Nunez intended to shoot Benavidez. And that would be countered at trial by Nunez saying, no, I didn't intend. It was a terrible accident. I was flipping the gun to my other hand, and my expert corroborates me that that would cause it to go off. Your Honor, this is the question of law. This is the question of law that gives this court jurisdiction. Right, we don't have jurisdiction if there is a material fact dispute. You do, I apologize. Under Kenny V Weaver. And if we agree with the district court that there's a fact dispute, we don't have jurisdiction over this interlocutory appeal. You do have jurisdiction, however, to decide a question of law. Whether or not it was a seizure is a question of law. Whether or not they've appropriately identified the consensus of cases that controls, it's their burden. I think the court erred in leaping first to the fact issues and summary judgment that rule 56 requires everyone to come to court with something beyond speculation. Right, we do have the video, but all the video shows is a shot. It does show the transition. We don't have evidence that he intentionally shot him. What we do have is evidence that it was an accidental shooting from the officer and from our expert. They don't have that. You still have not stated what the expert bases that opinion on. I'm sorry, sir, say it again. You still have not stated what the expert would base that opinion on. He based it on the video and the officer's testimony, Your Honor. That's all? He didn't analyze the two and say based upon my experience or my expertise? He did analyze it, Your Honor. It's in the record. The entire expert opinion is there in the record, and I encourage, Your Honor, to go look at that to see what his thoughtful analysis was. You know, I have done that, and let me just say this. I'm very sympathetic to the police officers in this case. It was a difficult situation, and it's possible, in my mind, that it was an accidental discharge. It's also possible that he may have pulled a trigger in the heat of the moment, not knowing who he was shooting at and made a mistake in that regard. I just don't know how you can tell that. To me, this is a classic example of a trier of fact. We need to make that determination based upon the video and all the evidence that's presented. Your Honor, let me end with this and say that Dr. Taylor's opinion was based on his expert law enforcement experience. And arriving at the conclusion for qualified immunity. Again, it's qualified immunity, if you don't analyze that first, it doesn't translate immediately into a fact issue. You have to look at whether or not there was a constitutional violation. And there's Supreme Court precedent that says it's not a constitutional violation. And they have no evidence, only speculation, that it's otherwise. They have the video, I see your puzzled look, Judge Alroy, but they have got to come forward with more than their personal belief that it was more than an accidental shooting. Yeah, it's a terrible thing that Mr. Benavidez got shot. It's a terrible thing, and we recognize that. But I see my time is out. Qualified immunity should have been granted. And my point in being here today, as I do believe the court has jurisdiction to decide these legal issues, a jury shouldn't be deciding whether qualified immunity applies, and whether there's a clear consensus of cases, which they have not met that burden. That should be a burden that's decided here at the court. And I- Thank you very much, Ms. Bradley. You've saved time for rebuttal. Thank you. We'll hear from Mr. Gale. Good morning, Your Honors. My name is Chris Gale. I have the pleasure of representing Mr. Benavidez in regards to this unfortunate situation, but it is what it is. I find it interesting that we're here today for an officer that shows up at a potential home invasion, only to invade a home. Case law is very clear, as I delineated in my brief, that an officer without exigent circumstances doesn't have the right to do some sort of search of a home, and yet he did. He walked right up to the door, put his hand on the . . . and he was intending on going inside. I think he lost information from the dispatcher. Well . . . Because the dispatcher said it was some kind of home invasion emergency, but that's not what she had called in, so . . . And I don't . . . as the court had just recognized, I mean, I don't know necessarily that the facts leading up to the shooting are that important for the purpose of making a determination in regards to qualified immunity issues in regards to . . . But he just was saying that he shouldn't have gone in. If it was, in fact, an ongoing home evasion, then maybe he would have had the right to go in. Well, and he could have, but he testified that there were no exigent circumstances, and that he did not have the right to enter, which he did. Now, granted, the shooting itself is what caused the damage in this case, and hence we didn't ask for the search and seizure issue in regards to this, because it seems for naught, but that is really irrelevant. At the time when he shot, what we have is an unarmed person who hasn't threatened anybody, hasn't committed a crime, hasn't done anything whatsoever. With any analysis under the reasonableness or otherwise, there is no facts to support the ability to shoot that person. The only thing that saves them is sort of this evolving narrative, and I see an evolving narrative. This case exemplifies that. When in the video, what do you see? You see him holding a gun. You see his two hands on the gun. We obviously know without some kind of evidence in regards to some malfunction for the gun that he pulled the trigger, and so is it reasonable based on the video to believe that he pulled the trigger because he was caught off guard or some kind of surprise or something of that nature? No, it's not unreasonable. That's what creates the genuineness of the fact issues in regards to this case, and obviously, whether he intended to shoot intentionally or he accidentally shot is going to be material to it, and that's why the district court denied it as sort of the ultimate fact issue. When . . . The counsel seems to think that you don't have any case law to support the idea that you have to give a warning before shooting someone. Do you have any case law that says you must give a warning? I saw the argument. I responded to it. We're talking about a series of case law that begins with Tennessee versus Garner, which is the shooting of an unarmed citizen. That's in 1985. You've got Bazan in 1901. You've got numerous other cases, and I could lead you the list, but the most recent one I can think of, and it was issued in the same year before this incident, is Cole versus Carson, which two of your Honors participated in. In that opinion, much like many others in regards to finding that this is an obvious case, all of those cases delineate that. You've got the Samuel versus Houston case, which we cited, and while it's only a district court case, it cites to the Relaford opinion and the Cole opinion, all of which occurred in 2019 before this incident, 2017. You've also got the Ramirez and the Newman cases. Ramirez was one that I argued before this court in regards to the tasing issue, but all of these cases dictate and say the same thing repetitively. It is a constitutional violation to hurt or harm a citizen who is unarmed and non-threatening, period. Their point that there is no case law out there is just with their hands tied behind their back, they're crossing their fingers. It exists in plethora. Even if it didn't, this is an obvious case. I would state, I'm kind of going back in history a little bit, but the Hope case that was, I think Polzer, Hope versus Polzer, the United States Supreme Court had originally said, look, we're not going to go into this analysis anymore. You can have . . . You don't have to rely on Hope v. Pelsier here, do you, sir? I don't think so. I think there's a plethora of cases that support it, but even if there weren't, this is an obvious case, and it is one just as in Cole found, that's why we filed the objection to the jurisdiction in regards to this early on. This is a case in which they keep arguing about the genuineness of what the court found, and that is not the subject of an appeal. This court lacks jurisdiction just based on that alone. They don't even address the materiality issue in regards to this whatsoever in their briefing at all. And it's strange that we're here because they argue that it was an accident, but yet they rely upon these objective reasonableness because there could have been somebody who was a criminal inside. That's their entire justification for a shooting that they don't even say was intentional, so it seems at odds with their argument. How do you argue that it's unintentional? How do you argue that, I mean, he knows that if he shot an unarmed, non-threatening homeowner, that that is going to be an obvious violation? So the narrative gets created. In the video, what do you see? You see what can be an intentional shooting. It certainly is reasonable to believe that, and that's what the court found. But what you don't see is almost as important. You don't see in his early reports. You don't see on the video. You don't see anything from anybody from Nunez saying, my God, I'm so sorry. I didn't mean to shoot you. He doesn't tell anybody that. He doesn't report it as such. He never once says anything about this being an accident until two years later when he talks to Internal Affairs, and he says, it's possible that I hit the triggering mechanism when I was switching my hands. But the video tells otherwise. It's very clear, in that regard, I would ask the court to deny their appeal just on lack of jurisdiction alone. I know that the court originally, when it looked at it, went forward on it. But I still stand behind my assertion in regards to that. And the case law is very clear that you can review the materiality, which they don't, but you can't review the genuineness. And there's a genuine fact issue in regards to this. It is not speculation. I would agree with you if there wasn't a video at all of the incident. And we would have to come up with some kind of information to show what Nunez was thinking. One, Rule 9 doesn't require us to plead, nor to prove someone's state of mind based on direct evidence. The only way I can do that is to get the Perry Mason moment when Nunez admits that he shot intentionally. Because otherwise, how do you prove what's in someone's state of mind? You do it by the video. You do it by the circumstances. They presented no evidence of some kind of malfunction with the gun or any flaws, that there was anybody else that was involved in this. He had a gun in his hand. He put it in both hands. He shot. The video makes it very clear. I did want to address Judge Guidry's question in regards to the expert. I delineated my concerns with the expert's opinion in regards to my brief. I know that really wasn't discussed too much in regards to the district court's opinion, but I thought it was important nonetheless to kind of illustrate what the problem is with that kind of expert testimony. And typically, you would have somebody that's looked at the gun or done some testing or, you know, done these determinations. But all the expert did, and Ms. Bradley just said, he looked at the video and relied upon their client's testimony. That's it. That's what a jury does. That's why an expert testimony that does not rely upon his expertise or any methodology or anything else in this time, it just gets up there and looks at what the jury is going to make a decision in regards to it. That's why it doesn't come into evidence. And that's why I think the court properly sort of dismissed that. The Bryant v. Gilliam case that the court addresses and Ms. Bradley addresses in her brief as well, was one where they had it on video. The officer was leaning down. He had his gun in hand. He was trying to handcuff an individual and the gun went off. It was very clear, and there was no evidence otherwise that he had done anything. But that's not this case, and that is a completely different video that exists. In regards to the reasonableness, in regards to . . . I'm sorry, in regards to the seizure issue, they seem to make issue with the fact that shooting somebody is not a seizure. I delineated it in my brief. The case law is very clear from Hadari D., from Tennessee First Guard. A seizure does occur at the moment that a bullet enters. Now, they took concern with my case that I cite in there, and it was a case in which it had occurred after these events, but it had addressed the Hadari D. implications and everything else because in that, the Supreme Court did not say that they were addressing whether or not shooting an individual would constitute a seizure. What they said was, given Hadari D. and the history that shooting someone is a seizure, is it still a seizure if someone escapes? That was the issue in regards to that case. I think while they talk about the timeliness of the opinion, they forget about the purpose of it and the details in it. In regards to some of the other ones, and I'm kind of looking at the Cole v. Carson case. I know that Judge Englehart and Judge Elrod, you all entered a concurring opinion, I believe, in regards to that. You lacked jurisdiction. It didn't address, at least in your concurrence, whether or not you agree with the opinion, but it seemed to since it's a concurrence, but the opinion in that case said that it was an obvious case. That was one where a young boy was holding a gun to his own head. The police gave no warning and just shot him. Without any other evidence that he was a harm or threatening to harm them or anything else, without any kind of warning whatsoever, shooting him was a constitutional violation. In that court, it determined it was an obvious error. If Carson had been a burglar and not the father of the person at the home, would they have been able to shoot him without any warning or anything? No. Would we still be having a discussion about that? Well, I mean, if my client hadn't been shot, we probably wouldn't be here because I wouldn't be representing this partner. Right, but if they were a burglar and they still were shot without any warning, you can't just shoot the burglar unless they're supposing some threat to you or something. That's exactly right. In all of the cases, whether they talk about resistance or being unarmed or anything else, that's what I was saying. I don't know that the facts are so important leading up to it. There might be important for the purposes of giving a backdrop so that we're not resolving this in a vacuum or taking it in a vacuum, but at the end of the day, even if . . . and good thing is, I'm glad a kid didn't answer the door or open the door because we could have had a dead child on our hands. Whether it was a burglar, whether it was somebody that was a homeowner, you still have to have the facts that would lead you to believe that there's some kind of harm present at the time that you're using deadly force. That doesn't exist. They don't have it in regards to anybody in the house. They don't have it in regards to Mr. Benavidez. Even if there was an intruder that had come into the home but was now exiting the home, they wouldn't have any of the threats that are necessary under Tennessee v. Garner or any other cases, including . . . or otherwise, to show that they would have the right to shoot them at that point. I think I've covered everything I have. I would love to . . . I'd welcome any questions you might have. Otherwise, I can save you eight minutes on the day. Thank you. We have your argument. All right. Thank you. I just ask that you affirm the district court in its analysis. Thank you. Great, Your Honor. I would like the court, if they read one thing after this argument is closed, is to read my reply brief, which is document 35 and in the record, in this appellate record. In the Watson Bryant case, even though that is not precedential, in that case, this court wrote that a plaintiff must introduce evidence to contradict a defendant's version of events, even at summary judgment stage. Here are the plaintiff complaints that the county pled that Noonan's actions were accidental. When you look at the Bryant-Gillum case, even though it came out in 2020 after 2019, the court there, when you wrote, you wrote that the district court found that Brown to be qualified, the expert, to give an opinion based on his experience investigating police shootings, and there was no error to rely on that. So it would not be error for this court to look at Dr. Taylor's opinion in evaluating whether or not plaintiffs have disproved qualified immunity. Then I would like to say to the court, I heard about the Cole case, the facts in that case are terrible. A young man wandering in the woods with a gun to his head, the police came up upon him and just shot him in the back. These are not my facts. These are not my facts. It was a priority one call, it was a home invasion call, the officer was transitioning his gun, and it accidentally went off. It's just not a seizure. It's just not a violation of his constitutional rights. And the court made a mistake in its opinion where it said that I had to, that there had to be proof of both prongs of qualified immunity. Both prongs do not have to be proven. If we show that there wasn't a constitutional violation, the analysis can end there. And sometimes we can have a constitutional violation, but if there's no clear consensus of cases, the analyst, qualified immunity applies. But in the Samuel case that counsel referred to, again, it's not precedent, but the district court opinion came out after December 26, 2019, a shooting of Mr. Benefitis. And in that case, there was a fleeing, unarmed, non-threatening man who stopped running, sat on a fence, and he was shot. These are not my facts. This is a priority one call, coming up on the house, not knowing what's going on, door suddenly opens, my officer fumbles his gun, and shoots him in the leg. Not in the chest, not in the head. And when he goes into the house, he immediately applies a tourniquet and calls an ambulance. These are not the actions of a man who believes that he's just shot a burglar or an intruder. These are the actions of a man who is reacting to a terrible tragedy. Now Samuel is not precedent, but it's different. Those facts are just so different. And finally, I would like to say that... You wouldn't have called the ambulance and done the tourniquet if it was a burglar that he was shooting? Well, Your Honor, of course he would have. Of course he would. Why is that not the act of anybody after a shooting? Your Honor's point is well taken, but he didn't go into the house looking for somebody else to shoot. He immediately reacted and took care of him. I don't want you to think that this deputy didn't react without sympathy or understanding to Mr. Benavides who was shot. So I want to end, Your Honor, on the Brower case, again the Supreme Court case that says accidental contact between an officer and a civilian is not a Fourth Amendment seizure, even if it ends in an injury of the citizen. So a 1983 plaintiff claiming excessive force must show that the force was applied intentionally. And Your Honor, I don't think they've shown that under their qualified immunity burden. And I return the rest of my time to the Court. Thank you very much. We appreciate both arguments in this case and it's hereby submitted. The Court's going to take a brief...